Jamil L. White (Bar No. 244028)
Matthew Mellen (Bar No. 233350)
WHITE | MELLEN
5600 H Street, Suite 100
Sacramento, California 95819
Telephone:  (916) 594-7241
Facsimile:   (916) 594-7247

Attorneys for Plaintiffs
FAIZ A. JAHANI and
KHADIJA JAHANI

## UNITED STATES DISTICT COURT

## EASTERN DISTICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| FAIZ A. JAHANI, an individual; and KHADIJA JAHANI, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A; QUALITY LOAN SERVICE CORPORATION.<br><br>Defendants. | ) Case No.: 2:11-cv-00577-WBS-JFM<br>)<br>) HON. WILLIAM B. SHUBB<br>)<br>) **First Amended Complaint for Damages and**<br>) **Equitable Relief for:**<br>)<br>)   **1.  Fraud**<br>)   **2.  Negligence**<br>)   **3.  Wrongful Foreclosure – Violation of**<br>)      **California Civil Code sections 2923.5**<br>)      **and 2924 *et seq.***<br>)   **4.   Breach of Oral Contract**<br>)   **5.  Promissory Estoppel**<br>)   **6.  Breach of Implied Covenant of Good**<br>)      **Faith and Fair Dealing**<br>)   **7.  Violations of Business and**<br>)      **Professions Code § 17200, et seq.**<br>)   **8.  Quiet Title**<br>)<br>) **[JURY DEMANDED]** |

**PRELIMINARY ALLEGATIONS**

1.      Plaintiffs in this action, FAIZ A. JAHANI and KHADIJA JAHANI ("Plaintiffs") are the true owners and occupants of the residential property located at 9021 Bramblewood Way, Elk Grove, CA 95758  ("the Property").

2.      Plaintiffs bring this action against Defendants for damages, and equitable and injunctive relief resulting from the Defendants' acts or omissions as set forth herein concerning a loan modification agreement on the Property.

3.      As will be explained below, Plaintiffs were induced to default on their loan by Defendant JPMORGAN CHASE BANK, N.A ("JPMORGAN") in order to obtain a loan modification. Even as Plaintiffs made payments under the loan modification agreement, Defendants sold Plaintiffs' home without notice. Following the purported sale, JPMORGAN continued to accept payments under the modification agreement and lead Plaintiffs to believe that a loan modification was in place.

4.      While Plaintiffs could have cured their arrears prior to the purported sale, Plaintiffs now find themselves in a state of limbo. Although the Property has been re-deeded to them, Plaintiffs have received no communication whatsoever, whether in the form of mortgage statements, requests for payment, or letters, from any of the Defendants. Because of Defendants' deceit and unwillingness to communicate honestly with Plaintiffs, Plaintiffs are unable to determine the status of their interest in their home and mortgage loan without recourse to the courts.

**THE PARTIES**

5.      Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant JPMORGAN CHASE BANK, N.A is a diversified financial marketing and/or services corporation engaged primarily in residential mortgage banking and/or related businesses.  Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant JPMORGAN is a corporation regularly conducting business in the State of California. On or about September 25, 2008, JPMORGAN acquired Plaintiffs' loan in a transaction with the FDIC and subsequently assumed servicing responsibility for Plaintiffs' loan.

6.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant QUALITY LOAN SERVICE CORPORATION ("QUALITY") is a diversified financial marketing and/or services corporation engaged primarily in residential mortgage banking and/or related businesses.  Defendant QUALITY is designated as the Trustee under the deed of trust for Plaintiffs' loan based on a Substitution of Trustee recorded on about May 27, 2009.  Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant QUALITY is a corporation regularly conducting business in the State of California.

## STATEMENT OF FACTS

7.    In or about March 2007, Plaintiffs refinanced the then-existing home loan on their Property through Washington Mutual Bank.

8.    On or about September 25, 2008, JPMORGAN acquired Plaintiffs' loan in a transaction with the FDIC and assumed responsibility for servicing the loan.

9.    In about December of 2008, Plaintiffs first spoke to a JPMORGAN representative concerning a loan modification. Plaintiffs asked the JPMORGAN representative to consider granting them a lower monthly payment in light of their reduced income. At this time, however, Plaintiffs were current on their mortgage payments.

10.    JPMORGAN's representative stated that Plaintiffs could only obtain a loan modification if they were three or more months delinquent in their mortgage payments, and specifically instructed Plaintiffs to miss at least three mortgage payments in order to obtain a loan modification.

11.    In about February of 2009, after becoming three months behind in mortgage payments per the instructions of JPMORGAN's representative, Plaintiffs again spoke to a representative of JPMORGAN and asked about the next step to modify their loan. At this time, Plaintiffs had direct access to cash in excess of their arrears.

12.    JPMORGAN's representative informed Plaintiffs that they were eligible for loan modification, and requested that Plaintiffs submit detailed financial records. In about March of

2009, Plaintiffs submitted all paperwork asked for by JPMORGAN to initiate the loan modification process.

13.     From March, 2009 to June, 2009 Plaintiffs awaited a response from JPMORGAN regarding the loan modification.

14.     On or about June 5, 2009, Plaintiffs received a letter from JPMORGAN congratulating Plaintiffs for qualifying for a loan modification. Pursuant to this loan modification agreement, Plaintiffs were to make three payments of $1,240.00 in July, August and September of 2009.

15.     Upon receipt of the letter, Plaintiffs contacted JPMORGAN and spoke to a representative who instructed them to make payments under the modification agreement. Plaintiffs began making payments under the loan modification agreement on about July 1, 2009.

16.     Despite the above representations, foreclosure proceedings had already been initiated against Plaintiffs without their knowledge. Plaintiffs are informed and believe, and thereon allege, that Defendant JPMORGAN instructed their agent and co-conspirator QUALITY to record a Notice of Default on about April 14, 2009 and later a Notice of Trustee's Sale.

17.     Defendants never provided Plaintiffs with a Notice of Default or Notice of Trustee's Sale. As such, Plaintiffs are informed and believe, and thereon allege, that JPMORGAN's statements to Plaintiffs regarding the loan modification agreement were merely a device to buy time to consummate a foreclosure that they had themselves *engineered*.

18.     The arrears only existed because of the false representations of JPMORGAN mentioned above. At all relevant times, Plaintiffs had the money to pay the arrears.  However, Defendants were more interested in wrongfully foreclosing on the Property.

19.     To that end, no Defendant complied with Civil Code § 2923.5 by initiating contact with Plaintiffs to determine their financial situation in order to explore alternatives to the foreclosure on the Property in good faith.

20.     Defendant QUALITY is the trustee of the deed of trust. Defendant QUALITY wrongfully moved forward with this foreclosure despite the lack of any § 2923.5 compliance and the lack of any notice, in the form of a Notice of Default or a Notice of Sale. As alleged herein, the sale occurred without Plaintiffs' notice.

21.     These facts reveal Defendants JPMORGAN's bad faith, and illuminate the role of Defendant QUALITY in the conspiracy to wrongfully foreclose on Plaintiffs' Property.

22.     On about October 5, 2009, Plaintiffs received a letter dated October 2, 2009 from JPMORGAN stating that Plaintiffs' modification was at risk and that an urgent response from Plaintiffs was needed. It stated that it required further documentation that was not provided to JPMORGAN in the initial submission of loan modification paperwork.

23.     On about October 7, 2009, Plaintiffs telephoned JPMORGAN asking why it claimed to not have received certain documents they had already sent. Plaintiffs spoke with a representative by the name of "Tracy" who indicated to Plaintiffs that JPMORGAN had in fact received all documentation required of Plaintiffs and to disregard the letter sent October 2, 2009 as it was sent in error.

24.     Tracy further explained that the modification process could be time consuming, and instructed Plaintiffs to continue to make payments under the modification agreement. Accordingly, in October, 2009 Plaintiffs made a $1,240.00 payment to JPMORGAN under the modification agreement, which JPMORGAN accepted.

25.     On about October 20, 2009, Plaintiffs received another letter dated October 16, 2009 from JPMORGAN again stating that Plaintiffs' modification was at risk and that an urgent response from Plaintiffs was needed stating that it required further documentation that was not provided to JPMORGAN. Further, this letter, as was the case with all letters from JPMORGAN before or after it, made no mention of foreclosure proceedings instituted against the home.

26.     Despite these letters, and Plaintiffs' continuing payments under the agreement, a purported "trustee's sale" of Plaintiffs' Property was held on about October 14, 2009.

27.     Plaintiffs' Property was sold at the so-called "trustee's sale" on about October 14, 2009. Plaintiffs had no notice whatsoever of this so-called "sale."

28.     Starting in about late October 2009, individuals began to approach Plaintiffs at their home indicating that the Subject Property had been sold at auction, that Plaintiffs were no longer the owners of the Property and that these individuals were interested in purchasing it. Each time this occurred, Plaintiffs became extremely upset.

29.     The first time this occurred, Plaintiffs immediately telephoned JPMORGAN and were able to reach the same Tracy they had contacted in about October 2009. Tracy stated that the house had not sold at auction and that the individuals approaching their home were trespassing. Tracy then reassured Plaintiffs that the home had not sold at auction and that it was still theirs. Tracy told Plaintiffs that the modification was still in place, and instructed them to continue making their payments under the modification. Plaintiffs did so.

30.     On or about January 31, 2010, Plaintiffs were sent yet another letter from JPMORGAN stating that their modification was at risk and that it required additional documentation.

31.     On about February 1, 2010, JPMORGAN sent another letter to Plaintiffs acknowledging that the modification was in process.

32.     Next, also on or about February 1, 2010, Plaintiffs called JPMORGAN regarding their modification and were told by a JPMORGAN representative in the "REO" department that the Property had indeed been sold at auction in October of 2009, and that Plaintiffs no longer owned it.

33.     Plaintiffs were then transferred to representative "Janet" in JPMORGAN's "loss mitigation" department. Plaintiffs demanded to know why they had received statements every month since July 1, 2009, why JPMORGAN continued to accept Plaintiffs' payments under the modification agreement, and why it continued to demand documents for a loan modification. Plaintiffs further demanded to know why their house was listed as sold at auction and bank-owned when they had not been given any notice of a sale. Plaintiffs also demanded JPMORGAN send them a history of their payments under the modification agreement.

34.     Janet informed Plaintiffs that there was no sale of their Property and stated that the sale was just a "mistake" on JPMORGAN's part and that records needed to be "updated." She stated the records would be "updated" within seven to ten days.

35.     Janet further claimed that she, at that very moment, was sending e-mails and correspondence "everywhere" within the company to rectify the situation. She asked Plaintiffs to allow her time to clear up the misunderstanding.

///

36.     Janet stated that a representative would review Plaintiffs' file and contact Plaintiffs within ten days.

37.     Janet further stated that Plaintiffs would receive the permanent modification as promised when their file was reviewed by this representative.

38.     On or about February 10, 2010, Plaintiffs again contacted JPMORGAN to find out the status of their loan modification. Plaintiffs were able to contact representative "Denise" of JPMORGAN, who stated that she had no new information for Plaintiffs at that time.

39.     On or about February 12, 2010, Plaintiffs again contacted JPMORGAN and spoke with a representative named "Kristal" and demanded proof that JPMORGAN had received and cashed the payments Plaintiffs made under the modification agreement since July 2009. Kristal faxed Plaintiffs this payment history.

40.     On or about February 13, 2010, Plaintiffs received another letter indicating they had failed to provide certain documents JPMORGAN required.

41.     Also, on or about February 13, 2010, Plaintiffs received a telephone call from a representative of JPMORGAN named Brenda McDougal ("Brenda"). She stated that she was assigned Plaintiffs' file and that she would be working on their modification and that JPMORGAN *again* needed *all* the documents required for a loan modification to be resubmitted to her. Brenda further stated that as soon as Plaintiffs submitted the documents, the permanent loan modification that they had been promised would be completed.

42.     Plaintiffs provided all information Brenda asked of them.

43.     On or about February 22, 2010, Plaintiffs were told by Brenda that she had received all necessary paperwork for the modification.

44.     Plaintiffs had approximately four different calls with Brenda throughout February 2010. Each time she stated that Plaintiffs had a modification agreement in place but that JPMORGAN needed additional information from them.

45.     In or around the end of February 2010, Plaintiffs received two separate IRS forms 1098. One noted that Plaintiffs had paid $5,308.88 in mortgage interest for the 2009 tax year. The other stated that the Property had been sold or abandoned by Plaintiffs.

46.     In or about March of 2010, Plaintiffs contacted Brenda. Brenda stated that it was possible that Plaintiffs may have incorrectly filled out information on some forms it had asked for and that it was way too soon for her to provide any more information to Plaintiffs.

47.     In about June or July 2010, Plaintiffs received a letter informing them that their modification was denied.

48.     JPMORGAN's representatives never told Plaintiffs that it would not grant them a permanent loan modification as promised and that if they wanted to keep their home, Plaintiffs had to continue making regular mortgage payments. Instead, by telling Plaintiffs to re-submit documents for the loan modification, by accepting Plaintiffs' payments under the modification agreement, and by explicitly telling them they had a permanent modification in place, JPMORGAN lead Plaintiffs to believe that they indeed had a permanent loan modification in place.

49.     Plaintiffs now believe that JPMORGAN had no intention of modifying their loan. Plaintiffs believe that JPMORGAN did not tell them to keep making their regular mortgage payments because it intended to create arrears and engineer a default on Plaintiffs' part which would allow foreclosure proceedings to begin on Plaintiffs' Property.

50.     Plaintiffs would have cured the arrears had JPMORGAN informed them that they needed to do so in order to keep the Property. Instead, JPMORGAN made false representations to Plaintiffs that they had a loan modification in place, and failed to provide Plaintiffs with any notice of foreclosure proceedings as was required by law.

51.     JPMORGAN's false statements and trickery prevented Plaintiffs from entering into the proposed loan modification, exercising their rights of redemption, being able to bid on their house at the sale, or from even verifying that the sale was conducted lawfully.

52.     Plaintiffs became aware that their home was sold at a foreclosure sale in October of 2009 when they received IRS forms from Defendants in about February 2010. The purported "trustee's sale" was rescinded in or about April of 2010.

53.     Currently, Plaintiffs are in a state of limbo. Although the Property has been re-deeded to them, Plaintiffs have received no communication whatsoever from Defendants after learning

that their loan modification was denied. Plaintiffs have not received mortgage statements, requests for payment, or letters, from any of the Defendants. Plaintiffs are accordingly unsure of the amount necessary to pay off the loan. As a result of Defendants' aforementioned conduct, Plaintiffs are left with no option but to bring suit against Defendants.

54.     Plaintiffs have been, and will continue to be, seriously injured unless Defendants' collection and/or threatened foreclosure proceedings and other activities complained of are not preliminarily and permanently enjoined.  Plaintiffs will suffer irreparable injury of a continuing nature that cannot be adequately calculated or compensated in money damages because of ongoing collection activity on the loan and foreclosure proceedings against Plaintiffs' residence.

55.     The deed of trust, under color of which Defendants JPMORGAN and QUALITY wrongfully foreclosed upon Plaintiffs' home, contains a provision for attorney's fees.

## ALLEGATIONS PERTAINING TO APPLICABLE STATUTES OF LIMITATIONS

56.     As to any applicable or relevant statute of limitations the doctrines of discovery and equitable tolling apply as follows:

57.     Plaintiffs learned that their home may have sold at a trustee's sale in about October of 2009 when they received IRS forms from Defendants in February of 2010. It was not until April of 2010, when told by their counsel and after being shown the Notice of Rescission of Trustee's Deed Upon Sale that they had confirmation that the property was indeed sold.

58.     It was not until about June of 2010 that Plaintiffs were told that they did not have a loan modification in place. Plaintiffs' Complaint is therefore timely.

### FIRST CAUSE OF ACTION
**Fraud**
**(Against All Defendants)**

59.     Plaintiffs incorporate by reference the allegations set forth above and below.

60.     Defendants conduct, as alleged above, constitutes fraud.

61.     Plaintiffs' specific allegations constitute a misrepresentation and/or concealment of material fact, and/or an act designed to deceive.

62.     As alleged above, Defendants knowingly and recklessly made false and misleading statements on which Plaintiffs relied on to their detriment, and were thereby damaged.

63.    JPMORGAN's representatives' statements that they would grant Plaintiffs a loan modification constituted false statements as JPMORGAN never intended to modify Plaintiffs' loan.  JPMORGAN representatives encouraged Plaintiffs to continue seeking a loan modification instead of advising them to either make their regular payments or to cure the default they engineered in order to remain in their home.

64.    In fact, each and every communication between Plaintiffs and JPMORGAN's representatives was designed by JPMORGAN to maneuver Plaintiffs into a default situation and then to trick them into not having knowledge of the foreclosure sale of their Property. JPMORGAN's statements made to Plaintiffs through its multiple representatives were false and designed to lull Plaintiffs into believing a loan modification was in place so that JPMORGAN and QUALITY could stealthily take Plaintiffs' Property.

65.    All of these representations made by each JPMORGAN's representatives were false and material and each Defendant knew that these material representations were false when made, or these material representations were made with reckless disregard for the truth.

66.    JPMORGAN intended that Plaintiffs rely on these material representations.

67.    Plaintiffs reasonably relied on said representations by making payments of $1,240.00 from July 2009 to February 2010, and following all instructions offered by JPMORGAN's representatives. Further, Plaintiffs reasonably relied on said representations by not continuing mortgage payments after December 2008. This resulted in their home being secretly foreclosed on. Plaintiffs were forced to endure the trauma of strangers repeatedly coming onto their Property disturbing them and telling them their home was bank-owned while JPMORGAN continued requesting payments under the modification agreement, and telling Plaintiffs not to worry and that their loan had been modified.

68.    JPMORGAN, through their representatives, told Plaintiffs not to make regular mortgage payments that would have brought their obligations under the fraudulent loan current and stopped the foreclosure. Plaintiffs are informed and believe, and thereon allege, that Defendant JPMORGAN was not interested in accepting such payments because they intended to foreclose

on  Plaintiffs Property from the beginning. The false representations were intended to allow JPMORGAN to continue the wrongful foreclosure process unbeknownst to Plaintiffs.

69.     Plaintiffs' specific allegations evidence the role of Defendant QUALITY in conspiring with Defendant JPMORGAN to defraud Plaintiffs.  As indicated therein, Defendant QUALITY expedited the foreclosure proceedings by using a Notice of Default that was facially invalid. Not only did Defendant QUALITY record this insufficient Notice of Default, but it also failed to serve this Notice of Default or a Notice of Trustee's Sale on Plaintiffs.

70.     All of these misrepresentations and/or material non-disclosures made by each Defendant, as indicated above, were false and material. Each Defendant knew that these material representations were false when made, or that these material representations were made with reckless disregard for the truth.

71.     Defendants intended that Plaintiffs rely on these material misrepresentations and material non-disclosures, and they did, in fact, so rely.

72.     As a result of Plaintiffs' reliance, Plaintiffs are entitled to actual damages including, but not limited to, loss of money and property including but not limited to losses through overcharges and unlawfully unfavorable loan terms, incurred attorney's fees and costs to save their Property, a loss of reputation and goodwill, destruction of credit, severe emotional distress, loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness, and depression, according to proof at trial but within the jurisdiction of this Court.

73.     Plaintiffs seek equity from this Court restoring title to Plaintiffs, and precluding any attempts by JPMORGAN and/or QUALITY to evict Plaintiffs prior to adjudication of the claims herein.

74.     As a proximate result of the Defendants' fraudulent conduct as herein alleged, Plaintiffs were duped and are now subject to the possibility of the loss of their family residence. Plaintiffs have suffered, and will continue to suffer, damages the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court.  Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.  In addition, Plaintiffs have been forced to retain a law firm to enforce their rights and have

incurred and will incur costs and reasonable attorneys' fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

75.     The Defendants' aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to Defendants with the intention on the part of Defendants of thereby depriving Plaintiffs of property or legal rights or otherwise causing injury. Defendants, and each of them, acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of Defendants, knowing that Defendants conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code § 3294, in an amount sufficient to punish or make an example of Defendants.

## SECOND CAUSE OF ACTION
### Negligence
(Against All Defendants)

76.     Plaintiffs incorporate by reference the allegations set forth above and below.

77.     JPMORGAN and QUALITY owed Plaintiffs a general duty not to record invalid documents on title of the Property and a duty to comply with Civil Code §§ 2923.5 and 2924.

78.     As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. However, there are instances where the law imposes a duty on the lender as described herein in reference to JPMORGAN and QUALITY. Defendants owed a duty to Plaintiffs because the following six factors favor Plaintiffs: (1) the extent to which the transaction was intended to affect Plaintiffs, (2) the foreseeability of harm to Plaintiffs, (3) the degree of certainty that Plaintiffs suffered injury, (4) the closeness of the connection between Defendants' conduct and the injury suffered, (5) the moral blame attached to Defendants' conduct, and (6) the policy of preventing future harm.

79.     In the present case, JPMORGAN owed Plaintiffs a duty based on these six factors Specifically:

80.     The loan modification agreement was intended to affect Plaintiffs in that it would determine the terms of their residential mortgage and whether they would reside in the Property.

81.     It was readily foreseeable that misrepresenting the details surrounding Defendants willingness to provide a loan modification and the foreclosure process, without giving notice or allowing Plaintiffs to cure arrears that existed as direct result of JPMORGAN's misrepresentations, would harm Plaintiffs.

82.     The conduct of Defendants from about December 2008 until about June 2010 warrants moral blame because these Defendants conspired to engineer a default on the part of Plaintiffs in order to foreclose on Plaintiffs' home.

83.     Further, it is clear that public policy will be better served if lenders are prohibited from engaging in such conduct.

84.     As a proximate result of the Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, damages, the amount of which has not been fully ascertained. Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.  In addition, Plaintiffs have been forced to retain a law firm to enforce their rights, and have incurred and will incur costs and reasonable attorneys' fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

85.     Defendants' aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to them with the intention on their part of thereby depriving Plaintiffs of property or legal rights or otherwise causing injury.  Defendants, and each of them, acted deceptively, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable detrimental and economic consequences to Plaintiffs, and to the direct benefit of Defendants, knowing Defendants' conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code § 3294, in an amount sufficient to punish or make an example of Defendants.

///

///

**FOURTH CAUSE OF ACTION**
**Violation of Civil Code sections 2923.5 and 2924** *et seq.*
(Against JPMORGAN)

86.     Plaintiffs incorporate by reference the allegations set forth above and below.

87.     Civil Code § 2923.5 requires, at least 30 days before a Notice of Default may be filed, that the borrower be contacted in person or by telephone to "assess" the borrower's financial situation and "explore" options to prevent foreclosure. The statute states, in relevant part: "(2) A mortgagee, beneficiary, or authorized agent shall contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure."

88.     Plaintiffs have an implied right of action under § 2923.5.

89.     Defendants never initiated contact in person or by telephone to assess their financial situation and explore options to avoid foreclosure prior the date of the Notice of Default's filing.

90.     Furthermore, Plaintiffs did not receive a copy of the Notice of Default ten days after it was recorded as required by Civil Code § 2924b(b)(1).

91.     In fact, the aforementioned foreclosure occurred without notice to Plaintiffs.

92.     Plaintiffs have suffered, and will continue to suffer substantial and irreparable injury from the loss of their Property as a proximate result of the violations of Civil Code §2923.5, which entitle Plaintiffs to an award of damages in an amount to be established at trial as well as attorneys' fees.

93.     As a result of the violation of the statute, Plaintiffs have been damaged, both generally and specially, in an amount to be proven at trial.

94.     Moreover, Defendants' conduct, as alleged above, constitutes acts or practices in violation of California Civil Code § 2924 *et seq*., and various subdivisions as follows:

95.     At all times relevant, Plaintiffs had the intent and means to tender a sum sufficient to cure the default, but were prevented from doing so by Defendants.

96.     Defendant JPMORGAN interfered with Plaintiffs' right to reinstate. Under California Civil Code § 2924c(e), "reinstatement of a monetary default under…a deed of trust…may be made at any time within the period commencing with the recordation of the notice of default

until five business days prior to the date of the sale." Plaintiffs, at all times relevant, had immediate access to cash in excess of the default. As such, Plaintiffs had the ability and intent to tender the sum required to reinstate the loan and prevent the loss of their Property.

97.     Defendant JPMORGAN did not tell Plaintiffs that in order to keep their home they had to bring their loan current by curing their arrears. Instead, JPMORGAN lead Plaintiffs to believe that they had a permanent loan modification agreement in place. Plaintiffs believed that the loan modification agreement was being processed and was a viable way to bring their loan current and save their home. Plaintiffs would have otherwise cured their arrears.

98.     JPMORGAN's false statements prevented Plaintiffs from exercising their rights of redemption when they had immediate access to cash in excess of the total amount of arrears due.

99.     Likewise, JPMORGAN never informed Plaintiff that foreclosure proceedings had begun. Instead, Defendant JPMORGAN continued to request, and accept, payments under the modification agreement even after it initiated foreclosure proceedings.

100.    Plaintiffs were able to cure their arrears from February 2009 until the date of the purported trustee's sale, and would have done so, had they been provided with notice of the purported trustee's sale. Through their failure to provide notice, Defendants prevented Plaintiffs from knowing the true date of the sale or when their right to reinstate would be extinguished. But for Defendants' direct interference with Plaintiffs' right to reinstate under 2924c, Plaintiffs would have reinstated the loan.

101.    The entire course of Defendant JPMORGAN's conduct alleged above is an attempt to circumvent § 2924 *et seq.* For instance, JPMORGAN's purposeful avoidance and evasion of modifying Plaintiffs' loan as promised to him in September 2009 constitutes an attempt to engineer a default when Plaintiffs were not in default, but were trying to pay.  Plaintiffs were able to make their monthly mortgage payments as of December, 2008, yet a JPMORGAN representative expressly told then to stop paying.

102.    Other violations of California Civil Code § 2924 *et seq.* include but are not limited to the following:

103.    Defendants JPMORGAN and QUALITY set forth the purported breach in the Notice of Default. This "breach" includes amounts that JPMORGAN specifically told Plaintiffs not to pay. This conduct violates California Civil Code §2924(a)(1)(C) which requires that the nature of an actual breach be known to the beneficiary.

104.    Likewise, Defendants violated California Civil Code §2924h which prohibits any person acting alone or in concert with others "to fix or restrain bidding in any manner."

105.    By deceiving Plaintiffs into believing there was a loan modification agreement in place, and then taking back the Property at a sale that was conducted without notice, Defendant JPMORGAN clearly "restrained bidding."

106.    As a proximate result, Plaintiffs have suffered, and will continue to suffer, substantial and irreparable injury from the loss of his Property as a result of the violations of California Civil Code §2924 which entitle Plaintiffs to an award of damages in an amount to be established at trial as well as attorney's fees. Plaintiffs further seek equity from this Court precluding any attempts by Defendants to evict Plaintiffs prior to adjudication of the claims herein.

<u>**FOURTH CAUSE OF ACTION**</u>
**Breach of Oral Contract**
(Against Defendant JPMORGAN)

107.    Plaintiffs incorporate by reference the allegations set forth above and below.

108.    In or about February of 2009, Plaintiffs and Defendant JPMORGAN entered into an oral agreement.  By terms of this oral agreement, JPMORGAN would modify Plaintiffs' loan on condition that Plaintiffs make three trial payments of $1,240.00 in July, August, and September 2009.

109.    The consideration agreed upon was fair and reasonable. Moreover, Plaintiffs forwent curing their arrears.

110.    Plaintiffs have performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of the oral agreement with JPMORGAN.  Specifically, Plaintiffs made the three payments in July, August, and September 2009 to JPMORGAN, and continued to do so through about February 2010.

111.    JPMORGAN breached the said oral agreement by purposefully failing to modify Plaintiffs' loan as JPMORGAN's representatives stated JPMORGAN would do. Plaintiffs learned of this breach in or about June, 2010.

112.    Instead of modifying Plaintiffs' loan as promised, JPMORGAN's representatives made false and misleading representations to Plaintiffs that it would modify the loan. During this time, JPMORGAN requested more and more documents from Plaintiffs, with the intention of foreclosing on Plaintiffs' Property in October of 2009.  JPMORGAN breached its oral agreement with Plaintiffs by failing to grant them a permanent loan modification.

113.    By reason of JPMORGAN's breach of said oral contract as alleged herein, Plaintiffs have had their home foreclosed on, the foreclosure sale rescinded, and suffered other damages, including but not limited to damage to their credit.

114.    As a proximate result of the conduct of Defendants, as herein alleged, Plaintiffs have suffered, and will continue to suffer, damages, the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court.  Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.  In addition, Plaintiffs have been forced to retain a law firm to enforce their rights, and have incurred and will incur costs and reasonable attorneys' fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

### FIFTH CAUSE OF ACTION
**Promissory Estoppel**
(Against Defendant JPMORGAN)

115.    Plaintiffs incorporate all allegations of this complaint and re-allege them as though they were fully set forth herein.

116.    In or about February of 2009, Plaintiffs and Defendant JPMORGAN entered into an oral agreement.  By terms of this oral agreement, JPMORGAN would modify Plaintiffs' loan on condition that Plaintiffs make three trial payments in July, August, and September 2009.

117.    Plaintiffs have performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of the oral agreement

with JPMORGAN.  Specifically, Plaintiffs made the three payments in July, August, and September 2009 to JPMORGAN, and continued to do so through about February 2010.

118.    JPMORGAN purposefully failed to modify Plaintiffs' loan as JPMORGAN's representatives stated JPMORGAN would do upon Plaintiffs completion of three trial payments.

119.    Instead of modifying Plaintiffs' loan as promised, JPMORGAN's employees continued to accept payments under the modification agreement, and lead Plaintiffs to believe that JPMORGAN would process and approve their loan modification upon resubmission of documents, each time requesting more and more documents.

120.    By promising Plaintiffs to modify their loan as a means to bring it current and avoid a trustee sale, JPMORGAN presented Plaintiffs with a compelling reason to opt for negotiations with JPMORGAN rather than exercising their equitable right of redemption. JPMORGAN should have reasonably expected Plaintiffs to rely on their promises to modify the loan, continuing requests for payments under the modification plan, and subsequent requests for the resubmission of documents to consummate the loan modification agreement.

121.    Further, in reasonable reliance on JPMORGAN's promise to modify his loan, Plaintiffs continued to work with JPMORGAN to complete the loan modification agreement as alleged herein. Said reliance prevented Plaintiffs from exercising their equitable right to reinstatement under Cal. Civ. Code §2924c.

122.    By reason of Plaintiffs' reliance on Defendants' promises as alleged herein, Plaintiffs have suffered, and will continue to suffer, damages, the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court.  Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.  In addition, Plaintiffs have been forced to retain a law firm to enforce their rights, and have incurred and will incur costs and reasonable attorneys' fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

///

///

**SIXTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
(Against All Defendants)

123.     Plaintiffs incorporate by reference the allegations set forth above and below.

124.     The loan agreement at issue included the written promissory note and deed of trust. Each of these agreements contained an implied covenant of good faith and fair dealing under which Defendants were obligated to refrain from engaging in any conduct the would prevent Plaintiffs from fully enjoying the benefits of these contracts.

125.     Plaintiffs are informed and believe, and thereon allege, that Defendants JPMORGAN and QUALITY breached the implied covenant of good faith and fair dealing by interfering with Plaintiffs making their payments under the terms of the loan with the intent to continue receiving greater amounts of financial gain at the expense of Plaintiffs.

126.     Further, as members of the class of persons protected under Civil Code § 2923.5, Defendants' compliance with this statute was and remains a benefit to which Plaintiffs were entitled as an implied covenant of the loan agreements. However, in failing and refusing to comply with the foreclosure avoidance provisions of Civil Code § 2923.5, Defendants breached the subject loan agreements by the following: (1) failing to evaluate Plaintiffs financial condition regarding foreclosure avoidance; (2) failing to advise Plaintiffs of their statutory right to meet with Defendants regarding such foreclosure avoidance; and (3) failing to advise Plaintiffs of the toll-free HUD telephone number regarding counseling opportunities to avoid the subject foreclosure.

127.     Furthermore, Plaintiffs allege that Defendants reported filing of the Notice of Default and, Notice of Sale, and the purported trustee's sale on the Subject Property to credit reporting agencies, and that such reporting damaged Plaintiffs' credit history and severely impaired Plaintiffs' ability to obtain consumer credit and home mortgage financing.

128.     As a proximate result of the conduct of Defendants, as herein alleged, Plaintiffs have suffered, and will continue to suffer, damages, the exact amount of which have not been fully ascertained but are within the jurisdiction of this Court.  Plaintiffs are entitled to incidental and consequential expenses and damages in an amount to be shown at the time of trial.  In addition,

Plaintiffs have been forced to retain a law firm to enforce their rights, and have incurred and will incur costs and reasonable attorneys' fees in connection herewith, recovery of which Plaintiffs are entitled to according to proof.

129.    The Defendants' aforementioned conduct consisted of intentional misrepresentations, deceit, and/or concealment of material facts known to Defendants with the intention of thereby depriving Plaintiffs of property or legal rights or otherwise causing injury. Defendants acted fraudulently, maliciously and oppressively with a conscious, reckless and willful disregard, and/or with callous disregard, of the probable consequences to Plaintiffs, and to the direct benefit of Defendants, knowing that Defendants conduct was substantially certain to vex, annoy, and injure Plaintiffs and entitle them to punitive damages under California Civil Code § 3294, in an amount sufficient to punish or make an example of Defendants.

## SEVENTH CAUSE OF ACTION
### Violations of Business and Professions Code § 17200 *et seq.*
(Against All Defendants)

130.    Plaintiffs incorporate by reference the allegations set forth above and below.

131.    Plaintiffs are informed and believe, and on that basis allege, that Defendants' acts, as alleged herein, constitute unlawful, unfair and/or fraudulent business practices, as defined by California Business and Professions Code § 17200 *et seq.* ("UCL"). The UCL borrows violations from other statutes and laws and makes them unlawful to engage in as a business practice. Plaintiffs' UCL allegations are predicated on the following:

132.    Defendants' fraud, as alleged above, violates the UCL.

133.    Defendants' violation of California Civil Code § 2923.5 constitutes a violation of the UCL.

134.    Defendants' violation of California Civil Code §§ 2924 *et seq.* constitutes a violation of the UCL.

135.    Defendants' negligence in the loan modification agreement and nonjudicial foreclosure constitutes unfair competition under the UCL.

136.    Defendants' breach of oral contract constitutes unfair competition under the UCL.

137.    As a result of Defendants' wrongful conduct, Plaintiffs have suffered, and continue to suffer, damages and injuries in an amount subject to proof at trial, including but not limited to damage to their credit and the costs of defending themselves against Defendants wrongful acts.

138.    Plaintiffs seek restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorney's fees, and such other and further relief as the Court may deem just and proper.

## NINTH CAUSE OF ACTION
### Quiet Title
(Against all Defendants)

139.    Plaintiffs incorporate all allegations of this complaint and re-allege them as though they were fully set forth herein.

140.    Plaintiffs are the rightful owners in fee of title to property commonly known as 9021 Bramblewood Way, Elk Grove, CA 95758. The basis of Plaintiffs' title is a grant deed to the property. The property is legally described as follows:

> LOT 350, AS SHOWN ON THE 'PLAT OF LAGUNA NORTH UNIT NO.4', RECORDED IN BOOK 190 OF MAPS, MAP NO. 11, RECORDS OF SAID COUNTY. EXCEPTING THEREFROM AN UNDIVIDED 5/85 INTEREST IN AND TO ALL OIL, GAS, ASHPALTUM, MINERALS, AND OTHER HYDROCARBO SUBDTANCES IN OR ON SAID LAND BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND TOGETHER WITH THE RIGHT TO PRODUCE, DEVELOP, EXPLORE AND EXTRACT SAID SUBSTANCES BUT WITHOUT THE RIGHT OF ENTRY ON THE SURFACE OF SAID LAND OR WITHIN 500 FEET FROM THE SURFACE THEROF AS RESERVED IN GRANT DEED RECORDED JULY 30, 1982, IN BOOK 820730 OF OFFICLA RECORDS AT PAGE 521. EXCEPTING THEREFROM AN 80/107 OF ALL RIGHT, TITLE AND INTEREST IN AND TO ALL MINERALS, AND MINERAL ORES, PETROLEUM, OIL, NAURAL [sic] GAS AND OTHER HYDROCARBON SUBSTANCE AND PRODUCTS DERIVED THEREFROM LYING BELOW A DEPTH OF 500 FEET BELOW THE SURFACE OF THE REAL PROPERTY DESCRIBED ABOVE, WITHOUT THE RIGHTS OF SURFACE ENTRY, AS RESERVED IN THE DEED RECORDED SEPTEMBER 26, 1986, IN BOOK 860926 OF OFFICIAL RECORDS, AT PATE [sic] 1998.

141.    As alleged above, Defendants JPMORGAN maneuvered Plaintiffs into a situation where it engineered an apparent default and then wrongfully foreclosed upon Plaintiffs in violation of numerous laws including California Civil Code §§2924 *et seq.*.

142.    Plaintiff seeks to quiet title as of the date this complaint was filed.

**DEMAND FOR JURY TRIAL AND PRAYER FOR DAMAGES**

WHEREFORE, Plaintiffs FAIZ A. JAHANI and KHADIJA JAHANI demand a trial by jury. Plaintiffs pray for judgment and order against Defendants, as follows:

1.  That judgment is entered in Plaintiffs' favor and against Defendants, and each of them;

2.  For an order requiring Defendants to show cause, if they have any, why they should not be enjoined as set forth below, during the pendency of the action;

3.  For a temporary restraining order preventing Defendants, or anyone acting in concert with them from causing the Property to be sold, assigned, transferred to a third-party, or taken by anyone or any entity;

4.  For a preliminary and permanent injunction preventing Defendants, or anyone acting in concert with them from seeking to evict Plaintiffs until the claims herein are resolved;

5.  For an order stating that Defendants engaged in unfair business practices;

6.  For damages, disgorgement and injunctive relief;

7.  For compensatory and statutory damages, attorneys' fees, and costs according to proof at trial;

8.  For exemplary damages in an amount sufficient to punish Defendants' wrongful conduct and deter future misconduct;

9.  For judgment determining that Defendants' claims to Plaintiffs' Property are without any right whatever and such defendants have nor right, title, estate, lien or interest whatever in the above-described Property or any part thereof;

10. Such other relief as set forth and requested above; and

///

///

///

///

///

11. Any other further relief this Court deems equitable and proper.

DATED: April 25, 2011                    Respectfully submitted,

                                         WHITE | MELLEN


                                          /s/ Matthew Mellen
                                         MATTHEW MELLEN
                                         Attorney for Plaintiffs
                                         FAIZ JAHANI and
                                         KHADIJA JAHANI

**VERIFICATION**

I, SARA JAHANI, am the daughter of the named Plaintiffs in the above-entitled action. My parents are temporarily absent from the country, but have invested me with power of attorney to act on their behalf. I have read the foregoing complaint, and the contents thereof are within my personal knowledge.  The matters set forth in the complaint are true to my personal knowledge, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 25th day of April, 2011 in Sacramento, California.


SARA JAHANI
Plaintiff

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

    I am employed in the County of Sacramento, State of California. I am over the age of 18 and not a party to the within action. My business address is 5600 H Street, Suite 100, Sacramento, California 95819.

    On April 25, 2011, I served the foregoing document described as: FIRST AMENDED COMPLAINT

    On all interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as stated on the attached service list:

[ ] **BY MAIL**- I deposited such envelope in the mail in Sacramento, California. The envelope was mailed, by certified mail, return receipt requested, with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Sacramento, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing affidavit.

[ ] **BY PERSONAL SERVICE**- I caused such envelope to be delivered by a process server employed by First Legal.

[ ] **VIA FACSIMILE**- I faxed said document, to the office(s) of the addressee(s) shown above, and the transmission was reported as complete and without error.

[ x ] **BY ELECTRONIC MAIL**- I hereby certify that I electronically transmitted the attached document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to below listed CM/ECF registrants.

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 25, 2011, at Sacramento, California

                             SHILOH BORSH

1

## __SERVICE LIST__

2

3

| | |
|---|---|
| Thomas N. Abbott<br><br>4375 Jutland Drive, Suite 200<br><br>San Diego, CA 92117<br><br>ph: (619) 326-2459 • fax: (619) 326-2430<br><br>tabbott@piteduncan.com<br><br>***Attorney for J.P. Morgan Chase*** | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28